We'll move to the third and final case of the day, 18-12887, Mama Jo's Inc. v. Sparta Insurance Company. Mr. Feltman, when you are ready. No hurry. May it please the Court, Paul Feltman on behalf of the appellant, Mama Jo's doing business as Barry's Restaurant. I have a couple distinct areas that I think that need to be addressed, and one of them is the Court's elimination of our experts, which then led to the ruling on the summary judgment. And then the other one would be an issue of whether or not our clients have a right to have the property, at a minimum, cleaned. What I'd like to say is there was a stipulation in the record that the parties agreed that this road construction that went on for a year and a half next to the restaurant, the dust and debris from the restaurant, there's no question about that. So that happened. And so none of the parties really ever said that they didn't, although there are some issues of, well, should some testing have been done. So I wanted to just go quickly through the experts, and I'll go as quick as I can. And what I'd like to say first is an expert under the Rule 702 has the ability to be qualified based on their experience. They don't need to have a scientific basis. There's no real disputer about qualification, right? This is a methodology? No, it's not about the qualification. That's correct. It's about methodology. This is a first-party insurance claim. It's not a medical malpractice claim. It's not a products liability claim. These are very straightforward issues as it relates to this construction debris, which is limestone, cement, concrete, and dust, going onto the property and adhering onto an outdoor, the way that the restaurant is set up is there is an outdoor part of the restaurant. You know what I think in the limited time you have is that you probably need to explain to us why it is that the District Court abused its discretion in applying DALVRT to your three experts. I will. Mr. Posada, who is our audio and lighting expert, he had inspected 20 to 30 systems such as the ones at Barry's for dust and debris in the past six to eight years in various cities, Miami, New York, and Boston. In this case, why did the District Court abuse its discretion in deciding that his use of this listen and look methodology wasn't reliable? What he said was that the listen and look was not reliable. The point is, just so it's a similarity case, their expert, Mr. Oluyo, just went in and walked through and listened to the system. Our expert went through, looked at the lighting, looked at the LED board, saw that all the lights were out, saw dust in the lights. He also, in his years of experience, because he has a master's and his undergrad in sound engineering, was able to hear that there was an infiltration of dust into the speaker. What he said was the sound was tedious, distorted, and hard to explain in words. That's correct. That could describe my singing. Well, the point is, Your Honor, I don't know about your singing, but I do know that he's had these 20 or 30 cases where he's gone into where there's been demolition and he's heard this type of damage to the speaker system. The speaker has a coil in it, and once it gets infiltrated in there, that coil will not move. Isn't it so hard to describe or hard to explain in words, merely a confession, that Daubert isn't met? I mean, a methodology, in order to be reliable, surely must be discernible, describable. It is describable. He said, tedious, I don't know if I can give you an exact word, it's hard to explain in words. It's distorted. That's just kind of like, I know it when I hear it. No, it's distortion, and I will tell you that a 14-year-old kid who plays guitar in Nashville can tell you when the speaker's blown out. It's not that difficult to do, and that's why I'm going back to the issue that this is a first-party case, and based on his experience in hearing these, he was able, again, it's experience to be able to make that, discern that. How did the district court misapply the Daubert rules? Because the district... You're going to have to convince us that the court either misapplied the Daubert formula rules, we'll call them, or made erroneous fact-finding. Because the experience that he had in the field was proper to qualify him... We agree with the experience, they're qualified, but that doesn't end the question. How did the district court misapply Daubert in this circumstance? What rules did it misapply? It misapplied, I think, because it did not, I think it, quite frankly, not taking this as a first-party insurance claim and understanding that in many of these types of cases, this is the type of analysis that is done, and it was proper in this case, if their expert could just come in and walk through and say, I listened to some music that was kind of low or medium, and I can make a decision that it's just fine. Our client went in, took out speakers, looked at them, and tested them. Did you challenge their experts? Yes, we did. We did challenge their experts. It wasn't ruled upon because the judge ruled upon our experts in order to get to the summary judgment. That's Mr. Posada. Did you challenge their methodology? Yes. Yes, we did. We did, and their awning expert went in and used his normal visual senses, quote-unquote, experience in the awning business, and he did no lab testing. Nobody did any lab testing. Let me just ask you, since the issue here on this appeal is the district court's occlusion of your experts, to Judge Choflat's question. The Daubert court gives us these factors. They're not sort of the gospel, but they are factors that inform our decision. For any of your experts, were the methodologies that they were using tested? Yes. Subject to peer review? Known error rate? Generally accepted. Those are the four you've got to contend with. Mr. Brezuela has thirty-three years of experience in assessing commercial and residential property for structural and architectural damage. He had also, in addition . . . The district court made fact findings about that, didn't it? Yes. How are the district court's fact findings . . . Because . . . It properly applied methodology. Do you agree? I'll tell you why. I mean, it followed . . . The methodology . . . It made an inquiry about methodology. Correct. Okay. In the unrebutted . . . So, the question now becomes whether the district court's fact findings on that methodology issue are clearly erroneous. It is clearly erroneous, Your Honor, and I'll tell the panel why. Because our unrebutted testimony of our expert was that . . . Did he have to believe it? The tact . . . Did the court have to believe it? Well, it was a deposition testimony. I understand . . . We're talking about fact findings now. I understand that. Okay. The court had testimony before it about methodology. Correct. And found that wanting. I understand. Whether or not the court committed clear error, which includes rejecting the credibility or the statements of the experts. Okay. He . . . And I understand. Maybe I'll just make this point. He testified that the tactile testing that he had done was common within the industry. That wasn't . . . So, to reject that, there was nothing that would base on his ability as a judge not being someone who studied cement as Mr. Brizuela had done or construction debris and how it affects properties. I don't believe that he could inherently, without some other testimony to rebut it, conclude that the test and the methodology was incorrect when the industry allows for it. So that would be my answer to that question. There's not some competing methodology. This is 33 years of experience. You've got an engineer professional who's done this type of work before. This is clear. It seems to me the issue in your case, though, is the walkthrough is two years after the construction. Correct. And the teenager in Cleveland, Rock and Roll Hall of Fame, can say that speaker's blown, but can't necessarily say why that speaker's blown. The methodology here had to connect, it seems to me, the sedentary or dust from the construction two years before to what was wrong with speakers currently. I'm just curious why the district judge erred in saying the methodology was not sufficient to connect those two. Because, first of all, water would not have affected these speakers. They're outdoor speakers and that was testified to. The only thing that infiltrated, which everybody agreed, was the dust and construction debris into the property. And so, again, going back to what you're saying, experts come in on first party cases and they come in a year after, two years, three years after. This is not an uncommon thing that experts do in first party claims. Because it takes a while sometimes for a denial of a claim and for it then to find its way into a place where an expert is going to be analyzing it for the first time. And so, that would be my answer to that question. This is typical within this type of litigation in first party claims, that it isn't after the fact. Something, they're not going to show up the day after a hurricane and go look at your roof. That's not how it happens. They may be there a year and a half, two years later, and they have certain methodologies they're going to go through to determine that. Everybody agreed that the dust and the construction debris came onto the property and he testified that it adhered to it. The only other one was the man who installed the awnings. He had also testified in a case, in a deposition, and he had also seen . . . he installed them. He had also seen other cases where construction debris had affected the awnings that he had installed or otherwise he had inspected. I do have one other issue that I do need to address with the court and I'll do it on my . . . Why don't you take . . . I'll take the time. Can we reset him for one minute? Give us the highlights. The highlight is the cleaning of the property and the contract of insurance contemplates that interior dust would not be covered unless it was caused by a wind created or other peril that would allow it to come in. This is an all risk policy, meaning unless it's excluded or limited, it's covered. You're relying on the exclusions. Well, I'm explaining their exclusion with regard to interior dust. They did not exclude the exterior dust, which everybody agreed migrated onto the property on the outside and has affected the awning and the railings, the awnings which are retractable for this outside area of the restaurant. That was not something that . . . everybody knows it was there and it needs to be cleaned. There was a cleaning estimate of $16,000 some odd, which was made. The exterior dust was not excluded and it is something that should have been covered. At a minimum . . . So he never got to exclusions or limitations, right? He just didn't address them? No. He didn't get to the issue of that particular issue of the cleaning because he said the cleaning had to be the result of a direct physical loss. The restaurant was open each day? Parts of the restaurant were closed off. Mr. Snyder, the owner, testified that there were parts of the restaurant that were regularly closed off and were inaccessible. He had a full-time crew in the restaurant and then he had an outside company come in on a daily basis to clean it. Didn't he also testify that he never had to turn anybody away? People did walk away, but he didn't personally turn somebody away. He wouldn't do that, but people came in and walked out after seeing what was going on. He was giving people masks, free drinks, whatever he could to keep them there. And then just one other issue, which is the business income issue. Their expert, Ms. Fabricant, agreed with our expert, Mr. Garcia, that there only needs to be a slowdown. There does not need to be a complete cessation of the business in order for there to be a recovery. And so there was a methodology that showed the damages due to the Mr. Snyder testified that there were times where they closed off areas of the restaurant. And so I will reserve the balance of my time. Yeah, you'll have the full five minutes on rebuttal. Thank you, Your Honor. Mr. Mazza? Good morning, Your Honors. May it please the Court. Mr. Mazza on behalf of the Appellee Sparta Insurance Company. Despite the various issues raised in the omnibus order on appeal, that order should be affirmed for two primary reasons, both of which were touched by Beres during its opening argument. First, the District Court properly exercised its obligations under Daubert and conducted an exacting analysis of the expert's methodologies as proposed by Beres. The District Court has wide discretion under Daubert and its progeny to determine A, what it looks at when analyzing those methodologies, and B, the conclusions it ultimately comes to. Now, that discretion is broad, and by precluding Beres' experts, the District Court made the next step, which is, because Beres was relying solely on those experts to prove any actual tangible damage to the restaurant, when those experts were precluded, there was no evidence at all for the tangible damage claim, and summary judgment was properly entered on that. Second, all that was left after the preclusion of Beres' experts was its claim for cleaning. Now, neither the policy language itself, nor the case law in Florida or any other jurisdiction, has ever supported the proposition that expenses associated with merely wiping a foreign substance off of undamaged property, which remains in use, constitutes direct physical loss or damage under a first-party property policy, and if it pleases the Court, I'd like to address each of the experts that were precluded one by one and in the order that they were precluded by the District Court. The first expert . . . Well, what I'd like to know is this.  There's a lot of the evidence that you've brought up. The fact that you've brought up the fact that the methodology requirement under Daubert, it does not, the question then becomes whether its findings of fact under the methodology standard, if you will, are clearly erroneous. Correctly. Or a finding of law, one or the other. Or what? Or he misapplied Daubert, one of the other. Correct. He either misapplied Daubert, or one of his factual findings was manifestly erroneous, based on the record, and I don't think there's any anything in this record that would support the contention that the district court's findings of fact as to what the experts did or did not do was manifestly erroneous. For example, Mr. Posada, the audio and lighting expert. He testified that the only methodology for determining the cause and extent of damage to audio and lighting equipment was a QC diagnostic test. A test which actually involved opening up the materials, running them through a battery of tests, and then determining the cause and extent of the damage. He conceded multiple times it was the only methodology, but he didn't do it. Instead, what he did was a perimeter walk around this outdoor restaurant years after the construction, listened to some speakers, not all, and visually inspected components from 10 to 15 feet away. There's nothing in the record upon which the district court could have found that this was a reliable methodology for diagnosing damage to audio and lighting equipment. Frankly, I think it would have been an abuse of discretion to let him in on this record. There was a point made during argument regarding our audio and lighting expert. I believe his report is in the supplemental appendix. I think looking at his report and his opinions closely indicates that what he was doing was not affirmatively representing, hey, this specific thing caused damage, which I'm now hearing years later. What he said is, visually, I don't see anything wrong with this. To the extent that I'm going to determine what specifically is wrong with it, I need to open it up. I think there needs to be a distinction between what their experts were testifying to, the ultimate conclusions, which were very specific, and our rebuttal expert, which essentially just said, I don't see anything wrong with this and I'd need to test it to find that out. Am I correct in understanding there are three varieties of claims here, an initial cleaning claim, a business loss claim, and then a physical damage claim? Is that a fair way to characterize the . . . There are three claims. I'd categorize them a little differently. How would you characterize them? There's an initial cleaning claim, which is alleged to be a form of direct physical loss or damage. There is a later claim for actual tangible issues, audio and lighting, awning equipment, which is also a direct physical loss or damage claim, but it got brought into the case much later, after the case was already in suit. There is a third claim for business income. That's how I'd categorize them. Each one of those require a showing of actual physical loss in order to get to pay dirt on them? They do, Your Honor. The way this policy works, it's not an uncommon type of policy. It's got various coverage forms. One coverage form is for direct physical loss to property itself, which courts have consistently held that what that refers to is some alteration to the property itself, an impact due to hail, fire damage, something . . . That's the problem with the cleaning. Wiping off the dust doesn't prove any damage to the structure. Correct. I think there's the Columbia Knit case. I think it's a district court case out of maybe Oregon. We cited it in our brief. The court in that case says it perfectly. It says the mere adherence of molecules to a surface without more is not direct physical loss or damage to that property because there's no tangible change to it. I think the Universal Images case, which is a . . . I think it's a Sixth Circuit case out of Michigan, says something similar. That just mere cleaning of something with routine . . . Only a scientist or a judge would characterize that as mere adherence of molecules. I'm sorry, Your Honor. The record here is clear that once Barry's experts were properly precluded within the district court's discretion, all that was left was the cleaning claim, which was not direct physical loss or damage. It was expenses associated with routine cleaning using what Barry's owners and even its maintenance personnel described as their regular cleaning materials. Dust rags, blowers, misters, all the stuff they normally clean the restaurant with just more frequently. That's traditional economic loss. So turning back briefly to the experts, Mr. Thompson, the awning expert, although he was qualified, we're not challenging the district court's findings on qualifications. His methodology was essentially nonexistent. His opinion was that dust he observed years after the road work was in fact sediment from the construction, and when asked, what's the basis for your opinion, he said, well, I'm assuming it's the road work because I ate at the restaurant. When asked, well, what mechanical components have you seen damaged? He said, well, I saw a drive belt damaged. Well, why do you think the construction dust damaged the drive belt? I couldn't tell you seriously. It's not a methodology at all. It was pure speculation, and it was properly precluded. Mr. Berzuela similarly was precluded for having no methodology at all. He walked around the restaurant again years later. And I'd like to point out that there was a stipulation that dust migrated during the period of the road work into the restaurant. But that's not the same thing as saying that the dust that these experts are saying three years later in an outdoor restaurant is the construction dust from four years before. But that's exactly what these experts were saying. Mr. Berzuela walked around the restaurant for about an hour. His report indicated that he had seen damages to a variety of building components. But during his deposition, what he testified to was that the only thing he saw was some dust on awning framings, which hadn't caused any damage. And what he characterized as a haired paste on a railing, which he touched it to determine that it was construction dust from four years before. Now there's nothing in the record to indicate that that's a reliable methodology for determining what damage has occurred as a result of construction dust that's been in a restaurant for four years. And another point that the district court made, which is that even if that had nothing to say about the damages in the restaurant, Mr. Berzuela, he couldn't, with any degree of certainty, correlate anything that he saw in that restaurant to construction dust. They had to tie it to the policy period, which, as I understand, was about a year, wasn't it? It was a little more. 13 to 14, or 14 to 15, one or the other. Correct. What their burden is to show is some direct physical loss or damage during the policy period itself. And the policy period, I think, was September of 13 to September of 14. This is four years later when the inspections started. The inspections, I think, Berzuela was in December of 2017. You have to infer that that was the same thing occurred during the policy period. Correct. And I think the fact that none of these experts did any testing is important because what you have here is a significant analytical gap between what they're seeing in the restaurant and what their conclusions are. And that gap is an appropriate thing for a district court to look at in conducting a Daubert analysis. I think that's, I think, Your Honor, you made that issue in the U.S. v. Frazier case. That's the analytical gap between the methods and the data that the expert relies upon and the ultimate conclusions are fair game in a Daubert analysis. I'd like to briefly just discuss the business income claim because, as Your Honor's note, it requires direct physical loss or damage in the first instance. So if the order on appeal is affirmed as to the cleaning and the tangible damage is presented by the experts, the order should be affirmed as to business income because there needs to be some direct physical loss in the first place. What that type of coverage is for is, say, a fire in a restaurant damages two out of three pizza ovens. And as a result, the restaurant is unable to meet, to produce the same number of pizzas, its sales go down. That delta between what they were selling before and after versus what they're selling while they're getting their pizza ovens back online, that's what this type of coverage is for. It's not for just a loss of sales due to some casualty outside of the restaurant. So as a threshold issue, there needs to be some direct physical loss or damage. And once that's met, the insured, Barry's in this case, has the burden of showing that the loss of sales or whatever the business interruption that they're claiming is, is causally related to the direct physical loss or damage. And that was an independent basis for the summary judgment on the business income claim. And looking at this record, I've gone through it with a fine tooth comb, there's no evidence on which Barry's could rely to prove whatever it claimed was direct physical loss or damage actually was the cause of their loss of sales as opposed to the fact that there was road work going on 50 feet outside the restaurant, that the main ingress and egress out of the restaurant was severely hindered, it was never blocked, but it was tough to get around the area I think is what one of their experts said. So without that causal connection, the business income claim fails for that reason as well. Unless there are any further questions, your honors, I don't have anything else to add. Thank you. No, I think we've got it. Thank you. All right, Mr. Feltman, five minutes. Thank you. With regard to the issues as it relates to the case law on the direct physical loss and the issue of cleaning, which I think is covered because it's not excluded, the exterior cleaning under the policy, it's an all risk policy. We cited to Crosslink, which is a case of the Northern District of Georgia, which was construction and there was dust and it was covered and there was payment by Fidelity in order to have that cleaned. We also cited Western Fire Insurance Company versus First Presbyterian, that's out of Colorado. That was gasoline vapors which needed to be cleaned and these are things that are not causing this direct physical loss that is being explained by Defendant's Counsel. We also cited to Farmers Insurance Company of Oregon and that's out of the Oregon Supreme Court in 1993 and they had somebody who had rented a house and they had a methamphetamine lab in there and then it left the smell and the vapor from the methamphetamine and the cost of removing the odor was found to be a direct physical loss. We also . . . It looks like the case law nationwide is sort of set up, sort of coalesced around one of two tests, right? One, if we look out there, one is whether or not there's tangible damage and the other is whether or not the property has been rendered unusable. Do you contend that this fits either of those tests? It's not, no, because in the Crosslink and in the other cases that I've cited, it's not necessary that the property was rendered completely unusable. It's that there needed to be cleaning. I mean, you could go and live in the house that smelled like the person who had rented it had run a methamphetamine lab in it but it certainly wouldn't be comfortable and so it was something that was covered because it needed to be cleaned and so that and the other cases that we have cited, we cited to one where it was melon which is out of New Hampshire, which was one that was just a cat urine odor from another condominium unit and that needed to be cleaned because even though it didn't fall into what the defendant is talking about is this direct physical loss or damage and I'm not sure because I understand what the court's position is with regard to the experts. That is something that is a loss, a direct physical loss under this case law. There are two bodies of case law in the United States. It hasn't been settled in the state of Florida and some of them do require this direct physical loss which we thought we had shown through our experts and then there's this other loss by way of the cleaning which is not excluded which should be covered. I wanted to just go back and I understand the court's position with the experts. I do want to just make a couple of points. Neither of the parties . . . . . . Just to be clear, I don't think that we have intended to communicate a position about it. We've just been trying to ask sort of difficult questions of both sides. Thank you, Your Honor. The issue of the QC diagnostic on the sound and lighting system, our expert testified not only was the lights not working and the speakers were fouled but that it would cost more money to do that diagnostic which their expert didn't do either than it would be to replace the system because of the damages that have been incurred. With regard to our awning expert, as I said, he had participated in other cases in which awnings which he had installed, that he installed these, had been fouled by construction debris and had knowledge and experience in being able to assess that type of damage whereas their expert had no experience in that and kind of went in and just eyeballed it and said he took a look at it just like their audio lighting man walked through and finally, their expert as it relates to . Correct. Our defendants had the experience and did do the typical testing within the industry or had experienced in construction losses before whereas none of their experts did and they did what they testified they had done periously. Then finally on the issue of Mr. Brizuela's test which he testified he's a member of an institute with regard to cement and its testing and he talked about the tactile test. Their expert, his test, he went around with his finger and he licked it. He had a lick test. Quote, unquote. I'm not kidding. He did a lick test and he said, oh no, this is salt from the Biscayne Bay so they're about a mile. That was their expert. So what I'm saying is in these type of cases, you have to look at the experience of the experts. These are first party cases, it's normal that they come in, time passes and they come back in and look. Everybody stipulated that this construction dust migrated on the property and our experts had the expertise and had done this type of work before whereas their experts had not and I think that the judge should have looked at this and understood that the fact finding and the methodology, it really does allow in the first party case for this type of finding. So I would ask that the court reverse the finding of the district court and remand it for further proceedings. Thank you for your time today. Thank you. Thank you so much both of you. The case is submitted and court is adjourned.